877 P.2d 294

**RESOLUTION TRUST CORPORATION, as Conservator of Southwest Savings & Loan Association, F.A., Plaintiff–Appellee, Cross Appellant,**

v.

**WESTERN TECHNOLOGIES, INC., Defendant–Appellant, Cross Appellee.**

**1 CA–CV 92–0015.**

Court of Appeals of Arizona, Division 1, Department D.

June 16, 1994.

Gammage & Burnham by Richard K. Mahrle, Phoenix, for plaintiff-appellee, cross appellant.

Green & Baker by Michael L. Green, Michael Goodwin, Katherine E. Baker, Denise H. Troy, Scottsdale, for defendant-appellant, cross appellee.

## OPINION

McGREGOR, Judge.

Western Technologies, Inc. (WTI) successfully defended an action brought by the Resolution Trust Corporation (RTC). The superior court concluded that federal statutes prevented it from awarding WTI attorneys' fees against the RTC, unless WTI first pursued an administrative claim for those fees. We conclude that the trial court erred and remand for entry of an award of attorneys' fees in favor of WTI. We also affirm summary judgment in WTI's favor.

## I.

In May 1983, WTI entered a contract with Southwest Savings and Loan Association (Southwest) to perform geotechnical services for a proposed office development called Fairmount Place.[1] The agreement provided in part:

> The purposes of our geotechnical services are to evaluate subsurface soil and groundwater conditions, recommend procedures for the grading and underslab treatment in the building and parking areas, recommend bearing pressures and estimate settlements for the moderately shal-

low spread footings and belled caissons, present surface and subsurface drainage recommendations, and recommend flexible pavement design thickness(es) for the at-grade parking lot.

In June, August, and November 1983, WTI issued geotechnical reports. Its June report stated in part:

> Although the existence of subsurface facilities such as seepage pits, drywells, and underground utilities was not apparent, their presence may be anticipated. Therefore, the exposed excavations should be inspected for such features during construction.

At the time WTI performed its work, two gas pumps and four underground storage tanks (USTs) were present at the Fairmount Place site. In addition, one of the businesses on the site was a street sweeping operation that fueled its own vehicles. The contractor removed two of the USTs during construction of Fairmount Place.

In 1988, Southwest agreed to sell the Fairmount Place site to Facet Financial Corporation (Facet). In connection with the proposed sale, Thomas–Hartig & Associates, an engineering firm, completed an environmental assessment report. The report disclosed the presence of USTs and soil contaminated by petroleum hydrocarbons and other hazardous substances at the site. Facet refused to consummate the transaction when the USTs were discovered.

The RTC, acting as Southwest's conservator, filed its First Amended Complaint against WTI and others on June 8, 1990.[2] RTC alleged that WTI knew or should have known of the existence of the USTs and contamination of the site and that WTI breached its agreement with Southwest by failing to discover or to disclose the USTs and contamination. RTC sought to recover damages against WTI on the basis of breach of contract and negligence.

---

1. We view the facts in the light most favorable to RTC, the party against which summary judgment was entered. *See Ness v. Western Sec. Life Ins. Co.*, 174 Ariz. 497, 500, 851 P.2d 122, 125 (App. 1992).

2. Southwest filed the original complaint on November 6, 1989.

After filing its answer, WTI moved for summary judgment, relying upon affidavits from three expert engineers who opined that the standard of care for a geotechnical engineer did not include responsibility to locate and identify USTs or to discover soil contamination. The experts concluded that WTI had not breached the standard of care in its performance of the agreement. After RTC deposed the experts, it filed a response in which it attempted to show, through the experts' deposition testimony, that WTI breached the standard of care; it further argued that the motion for summary judgment did not address its breach of contract claim. After argument the trial court granted WTI's motion for summary judgment.

WTI then applied for an award of attorneys' fees, relying upon the terms of its contract with Southwest. WTI also sought sanctions against the RTC and its lawyers pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 12–349 and Rule 11 of the Arizona Rules of Civil Procedure. Seven days later, RTC was appointed receiver for Southwest. The court denied the request for fees and sanctions and entered final judgment in WTI's favor pursuant to Rule 54(b) of the Arizona Rules of Civil Procedure. WTI filed a timely notice of appeal, and RTC filed a timely notice of cross appeal. We have jurisdiction under A.R.S. section 12–2101.B.

## II.

We first address RTC's cross appeal challenging the propriety of summary judgment because if we reverse this ruling, then the issue whether the court should have awarded WTI attorneys' fees or sanctions becomes moot. RTC argues (1) the court incorrectly found that no evidence supported RTC's allegation that WTI had failed to meet its standard of care on RTC's tort claim and (2) the court ignored RTC's claim based on breach of contract.

## A.

RTC asserts that, contrary to the trial court's ruling, evidence existed from which a jury could find that WTI negligently failed to include notice of the USTs in its report.

RTC asserts that WTI's own experts provided the evidence by testifying that (1) if a geotechnical engineer knows that USTs are present, its report should include that fact because USTs can affect the soil's suitability for construction and (2) a geotechnical engineer should know of the existence of USTs when gas pumps and a refueling operation are located on site. Because these clues that USTs were on the site existed when WTI prepared its report, RTC asserts the trial court should have allowed the jury to decide whether WTI negligently failed to discover and report them. We disagree.

The scope of WTI's work as outlined in the agreement was to "evaluate subsurface soil and groundwater conditions." Each of WTI's expert witnesses stated that WTI performed its services within generally accepted standards of practice, that the applicable standard of care did not require WTI to provide environmental site assessment services as part of a foundation design investigation, and that WTI had no responsibility to discover or identify any underground USTs or site contamination. The expert witnesses also opined that WTI would have been responsible to discover and identify USTs or contamination only if WTI had been retained specifically to perform an environmental site assessment.

RTC contends that the "sole premise" of the motion for summary judgment was WTI's contention that it was not required to perform an environmental site assessment. RTC also asserts that the experts' subsequent deposition testimony raises the inference that WTI should have discovered and reported the USTs to Southwest. We disagree with both of these assertions.

WTI's experts all testified in their affidavits that under its contract with Southwest, "WTI had no responsibility to discover or identify any underground storage tanks which may have been present at the Fairmount Plaza [sic] site...." RTC attempts to take issue with this opinion by pointing out that in their deposition testimony, the experts agreed that the presence of a UST is part of the subsurface soil condition that a geotechnical engineer should evaluate. RTC

points to testimony in which the experts stated that *if* a geotechnical engineering firm discovered an underground structure, such as a UST, then it "would mention them in [its] report as it would affect the support of the foundations of the building or ... structure that [it is] helping to design."

This testimony, however, merely indicates that USTs can be important because their presence could affect subsurface conditions. The testimony does not address the issue whether the geotechnical engineer's standard of care requires it to discover the tanks. WTI submitted uncontroverted evidence that it was not required to do so as part of its geotechnical investigation and analysis. RTC submitted no controverting evidence and did not overcome WTI's motion for summary judgment on this essential point. *See, e.g., National Housing Ind. v. E.L. Jones Dev. Co.*, 118 Ariz. 374, 377, 576 P.2d 1374, 1377 (App.1978) (essential element of professional malpractice is plaintiff's damage resulting from defendant's conduct below the applicable standard of care; expert testimony is usually necessary to establish the standard of care).

### B.

RTC next contends that WTI's motion for summary judgment, which was based solely on a negligence theory, did not address WTI's liability for breach of contract. The contract required WTI to "evaluate subsurface soil and groundwater conditions." RTC asserts that discovering a UST clearly falls within the meaning of that phrase. We disagree.

In the typical situation between client and professional, the law implies a promise by the professional to "render competent ... service." *Barmat v. John & Jane Doe Partners A–D*, 155 Ariz. 519, 521, 747 P.2d 1218, 1220 (1987).

As a matter of public policy, attorneys, accountants, and other professionals owe special duties to their clients, and breaches of those duties are generally recognized as torts. The essential nature of actions to recover for the breach of such duties is not

one "arising out of contract," but rather one arising out of tort—breach of legal duties imposed by law.

*Id.* at 523, 747 P.2d at 1222. In some cases, however, an action against a professional can be founded in contract:

Where ... the duty breached is not imposed by law, but is a duty created by the contractual relationship, and would not exist "but for" the contract, then breach of either express covenants or those necessarily implied from them sounds in contract.

· · · · ·

Absent some special contractual agreement or undertaking between those in the professional relationship, ... a professional malpractice action does not "arise" from contract, but rather from tort.

*Id.* at 523, 524, 747 P.2d at 1222, 1223.

█ A breach of contract action arises out of the violation of a specifically enumerated duty. *See Asphalt Eng'rs, Inc. v. Galusha*, 160 Ariz. 134, 770 P.2d 1180 (App.1989). In *Galusha*, an attorney specifically agreed to file mechanic's liens and, if necessary, foreclosure suits, but failed even to file the liens. We held that a "special contractual agreement or undertaking" existed, and thus the action sounded in contract. 160 Ariz. at 138, 770 P.2d at 1184. By contrast, in the present case no "special contractual agreement or undertaking" existed. WTI agreed to "evaluate subsurface soil and groundwater conditions." The contract contained no specific agreement to look for USTs or other underground structures. Thus, this action for malpractice sounds strictly in tort, and RTC's breach of contract claim necessarily fails.

### III.

### A.

After the court granted summary judgment, WTI applied for costs and an award of attorneys' fees against RTC based on the contract[3] and an award of sanctions against

---

**3.** Section 1.5 of the "General Conditions" of the   contract states: "In the event of litigation be-

both RTC and its attorneys based on A.R.S. section 12–349 and Rule 11 of the Arizona Rules of Civil Procedure. RTC, which had in the meantime been converted from Southwest's conservator into its receiver, moved to dismiss the fees application. RTC conceded that WTI was entitled to fees under the contract and further conceded that the amount WTI claimed was reasonable. It nevertheless argued that 12 U.S.C. section 1821(d)(13)(D) prevented the court from addressing WTI's application for fees. The court agreed, stating:

> With respect to Western Technologies, Inc.'s claim for attorney's fees, the Court feels constrained by 12 USC § 1821(d)(13)(D) which the Court views as removing subject matter jurisdiction as a result of the receivership having been created. Were it not for the existence of the Federal statute, the Court would have allowed full attorney's fees and costs against Plaintiff in the amount of $35,924.55. The reason for signing the form of judgment without fees or costs is because of the FIRREA statute.

WTI appeals from the court's denial of its request for costs and attorneys' fees and the court's failure to award sanctions.

### 1.

On appeal, the parties vigorously dispute whether, as the trial court concluded, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), P.L. 101–73, 103 Stat. 183, automatically divests a state court of its jurisdiction over a claim being pursued against the RTC in its role as receiver for a failed financial institution. In *Resolution Trust Corporation v. Foust*, decided after the parties filed their briefs in this case, we held that FIRREA does not divest the state court of jurisdiction; rather, state and federal jurisdiction exist concurrently over a pending claim against the RTC as receiver. 177 Ariz. 507, 517, 869 P.2d 183, 193 (App.1993). The dispositive issue in this

case, however, remains. *Foust* did not decide whether a request for attorneys' fees arising out of contract or a request for sanctions arising from the RTC's conduct during litigation is a "claim" for purposes of section 1821(d)(13)(D).

In enacting FIRREA, Congress could have required a party such as WTI to present its request for attorneys' fees and sanctions to RTC before seeking a judicial ruling on the request:

> [I]n enacting an administrative review system Congress may vest exclusive original jurisdiction in the reviewing agency. "When exhaustion is statutorily mandated, the requirement is jurisdictional." *Townsend v. United States Dept. of Justice Immigration & Naturalization Serv.*, 799 F.2d 179, 181 (5th Cir.1986).

*Meliezer v. Resolution Trust Corp.*, 952 F.2d 879, 882 (5th Cir.1992) (citations omitted). As we discuss below, Congress did mandate that all "claims" against RTC initially be determined through the RTC's administrative review procedures. Thus, if a request for attorneys' fees and sanctions, submitted in the course of litigation, constitutes a "claim" under FIRREA, then the trial court correctly concluded that WTI's failure to follow the administrative procedures precluded the court from considering the request.

To resolve this issue, we must examine FIRREA and, in particular, the following section:

**Limitation on judicial review**

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation[4] has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

---

tween the parties of this Agreement, WTI shall be entitled to recover its costs and reasonable attorneys' fees if found to be the prevailing party."

**4.** RTC acknowledges that, "[a]lthough section 1821 sometimes refers only to [the Federal De-

posit Insurance Corporation], it applies equally to RTC" because 12 U.S.C. § 1441a(b)(4) grants RTC the same power and rights as FDIC under 12 U.S.C. §§ 1821 and 1823.

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D) (1989).

■ We address matters of statutory interpretation independently of the trial court's conclusions. *Siegel v. Arizona State Liquor Bd.*, 167 Ariz. 400, 401, 807 P.2d 1136, 1137 (App.1991). The following guides our interpretation:

In interpreting the jurisdictional requirements of section [1821(d)(13)(D) ], we will give it a reasonable, rational and sensible construction that will accomplish the legislative intent. To do so, we consider the words used and the effects and consequences of the statute. Moreover, we will construe various provisions of the statutory scheme to harmonize rather than to contradict one another, and will construe the words of the statute in conjunction with the context and subject matter of the entire act.

*Foust,* 177 Ariz. at 511–512, 869 P.2d at 187–88 (citations omitted).

■ "The starting point for interpretation of a statute 'is the language of the statute itself.'" *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990), quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). If the language of a statute is clear and unambiguous, the court will apply the plain meaning of the language unless a plain meaning interpretation would lead to an absurd result or a result at odds with the legislature's intent. *Id.; see also Resolution Trust Corp. v. Conner,* 817 F.Supp. 98, 100 (W.D.Okla.1993).

Although we are aware of no decision that addresses the precise question before us, the court in *Conner* considered an analogous situation. In *Conner,* the RTC argued that the defendant in an action brought by RTC could not assert an affirmative defense without first submitting the "claim" the defense involved to RTC's administrative process. The court first considered whether the language of section 1821(d)(13)(D) applied to an affirmative defense. Finding the statutory language clear and unambiguous, the court stated:

The word "claim," used as a noun as it is in the relevant statute, ordinarily means a "cause of action." *See Black's Law Dictionary* (5th Ed. 1979) at p. 224. The word "action" "in its usual legal sense means a suit brought in a court" or "a formal complaint within the jurisdiction of a court of law." *Id.* at p. 26. There can be no doubt that Congress employed the terms "claim" and "action" in their ordinary legal sense . . . .

*Conner,* 817 F.Supp. at 100. Under the statute, filing a claim with the receiver constitutes "a commencement of an action" for the purposes of any applicable statute of limitations. *Id.* at 101 (citing 12 U.S.C. §§ 1821(d)(5)(F)(i), 1821(d)(8)(E)(i)). Moreover, by definition, a party can raise a defense only in response to a claim asserted against it. Therefore, the court reasoned, affirmative defenses are not "claims" within the meaning of section 1821(d)(13)(D) because they are not independent causes of action. *Id.; see also Resolution Trust Corp. v. Midwest Fed. Sav. Bank,* 4 F.3d 1490, 1497 (9th Cir.1993) (adopting the *Conner* court's reasoning to hold that a district court has jurisdiction over affirmative defenses; defendant was not required to exhaust FIRREA's administrative claims procedure). *But see, e.g., Resolution Trust Corp. v. Scaletty,* 810 F.Supp. 1505 (D.Kan.1992); *Talmo v. Federal Deposit Ins. Corp.,* 782 F.Supp. 1538 (S.D.Fla.1991).

■ We find the *Conner* court's reasoning persuasive and applicable to requests for an award of attorneys' fees or sanctions. The statute does not define "claim"; it is therefore reasonable to assume Congress intended to give the word its ordinary legal meaning, i.e., a "cause of action." Just as affirmative defenses are not independent causes of action, a party's request for attorneys' fees, costs, or sanctions is not an independent cause of action. A party's right to recover these compensations from the RTC arises only when that party prevails in litigation or when the RTC engages in sanctionable behavior. In other words, no "claim" exists before the litigation begins.

Even if the language of subsection 1821(d)(13)(D) were not clear and unambiguous, our analysis of other portions of section 1821 reinforces the conclusion that a request for fees and costs is not a claim. *See Federal Deposit Ins. Corp. v. Canfield*, 967 F.2d 443, 446–47 (10th Cir.1992) (courts construe statutes by reading them as a whole). Several subsections in section 1821 refer to claims by *creditors* of the failed financial institution. For example, RTC must publish a "notice to the depository institution's creditors to present their claims" to the receiver by the published deadline, which must be at least ninety days from the date of publication. 12 U.S.C. § 1821(d)(3)(B). RTC also must mail a notice to "any creditor shown on the institution's books." *Id.* § 1821(d)(3)(C). The receiver may allow any claims received before the published deadline that the claimant proves to the RTC's satisfaction and "may disallow any portion of any claim by a creditor or claim of security, preference or priority" that the claimant does not prove to its satisfaction. *Id.* §§ 1821(d)(5)(B), 1821(d)(5)(D). These references to creditors throughout the statute indicate that Congress intended the claims procedure to apply to *creditors'* claims and causes of action, rather than to awards that arise only as the result of litigation.

RTC relies upon two cases to support its argument that attorneys are creditors and that a request for fees or sanctions is a claim under FIRREA. As RTC asserts, *Resolution Trust Corporation v. Elman*, 949 F.2d 624, 626–27 (2d Cir.1991) and *Federal Deposit Insurance Corporation v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 134–35 (3d Cir. 1991) held that parties must submit attorneys' fees claims to the RTC through the administrative claims process.

*Elman* and *Shain, Schaffer & Rafanello* are distinguishable, however, because both involved attorneys claiming entitlement to fees the failed financial institutions had agreed to pay before the RTC was appointed receiver. The attorneys' claims against the financial institutions thus were similar to other creditors' claims: the financial institutions had agreed to pay the attorneys money for services they had performed. In this case, however, WTI did not seek payment for goods or services it provided, nor did it seek compensation for an injury or for breach of a contract. Rather, WTI's claim for attorneys' fees, costs, and sanctions arose solely from its status as the prevailing party in a lawsuit the RTC initiated against it after RTC became Southwest's conservator and from its assertion that RTC and its attorneys engaged in sanctionable behavior during the litigation. WTI is not a creditor of the failed financial institution, but a prevailing party in litigation the RTC initiated.[5]

Furthermore, if the language were not clear and unambiguous, and if the statute as a whole did not indicate that requests for attorneys' fees are not "claims," we would conclude that an exception to the plain meaning rule applies. *Cf. Conner*, 817 F.Supp. at 102. The administrative claims statute requires RTC to publish a notice that it has taken over as receiver and that claimants must submit claims to the RTC by the published deadline. 12 U.S.C. § 1821(d)(3)(B). Often, the RTC takes over an institution and publishes notice of the claims statute requirements long before it files suit against a given defendant. If a request for attorneys' fees were considered a "claim,"

> literal application of the statute would produce a result demonstrably at odds with the intention of the drafters evidenced in the remainder of Section 1821(d), and would lead to the "patently absurd consequence" of requiring presentment and proof to the RTC of all potential [requests for attorneys' fees] that might be asserted [as a result of] unknown and unasserted claims or actions by the RTC.

---

5. RTC cites several other cases to support its arguments, including *Resolution Trust Corporation v. Mustang Partners*, 946 F.2d 103, 106 (10th Cir.1991); *New Maine National Bank v. Reef*, 765 F.Supp. 763, 766–67 (D.Me.1991); and *United Bank v. First Republic Bank Waco*, 758 F.Supp. 1166, 1168 (W.D.Tex.1991). These cases are not on point, however, because they involved counterclaims against the RTC or FDIC as receiver for failed financial institutions. In each case, the court held that it had no jurisdiction to consider counterclaims that had not been presented to the receiver through the administrative claims process.

*Conner,* 817 F.Supp. at 102 (citations omitted).

■ RTC next contends that we must, in any event, consider a request for fees and sanctions as a claim because any award must be paid from the assets of the depository institution for which RTC has been appointed receiver. We reject that argument.

First, RTC cites no authority for the proposition that an award of fees based on the RTC's unsuccessful breach of contract suit or an award of sanctions based on RTC's own litigation conduct must be paid from the assets of the financial institution, thus diminishing the assets available to satisfy the institution's creditors. In contrast, several courts have held that the court may award attorneys' fees against RTC if RTC loses a contract action. *Resolution Trust Corp. v. Heinhold Commodities,* 803 F.Supp. 1342, 1346–47 (N.D.Ill.1992); *Nance v. Resolution Trust Corp.,* 803 S.W.2d 323, 334 (Tex.App. 1990); *cf. Hellon & Associates, Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 300 (9th Cir.1992) (refusing to award attorneys' fees against RTC pursuant to A.R.S. section 12–341.01 because request was premature, but implying that award may be appropriate at later stage of litigation). *See generally Fobian v. Western Farm Credit Bank (In re Fobian),* 951 F.2d 1149, 1153 (9th Cir.1991) (creditor may be entitled to attorneys' fees in bankruptcy proceedings if contract provides for fee award to prevailing party, but where litigated issues involve federal law, not contract enforcement questions, federal law applies and each party must pay its own attorneys' fees), *cert. denied,* — U.S. —, 112 S.Ct. 3031 and 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992).[6]

We conclude that, if RTC chooses to engage in litigation in an attempt to increase the assets of a failed financial institution, it cannot then avoid the costs of litigation by claiming that the court cannot require RTC to pay because payment will diminish the assets of the financial institution. *See Heinhold Commodities,* 803 F.Supp. at 1349 ("Just as RTC had to pay its own legal and expert fees and associated costs for pursuing the litigation, it also undertook to pay Heinhold's fees and costs if Heinhold prevailed.").[7]

■ Interpreting the word "claim" to exclude a request for attorneys' fees also is consistent with the statute's goal of "dispos[ing] of the bulk of claims against failed financial institutions expeditiously and fairly." *Praxis Properties, Inc. v. Colonial Sav. Bank,* 947 F.2d 49, 64 (3d Cir.1991) (quoting H.R.Rep. No. 54(I), 101st Cong., 1st Sess., pt. 1, at 419, *reprinted in* 1989 U.S.C.C.A.N. 86, 215). Congress intended that creditors' claims be resolved, to the extent possible, through administrative procedures. Congress therefore directed that a creditor's failure to comply with the claims procedures results in disallowance of the claim, and this disallowance is final. *See* 12 U.S.C. §§ 1821(d)(5)(C)(i), (d)(6)(B)(ii). Only after exhaustion of these administrative remedies is judicial review available. *See Meliezer,* 952 F.2d at 882 (FIRREA "mandate[s] exhaustion of administrative remedies before judicial intervention"); H.R.Rep. No. 54(I), 101st Cong., 1st Sess., pt. 1, at 418 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 214 ("Resort to either the District Courts or administrative process is available only after the claimant has first presented its claim to [RTC]."). The exhaustion requirement "allows the RTC 'to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against

---

6. At least one court has held that, under 12 U.S.C. § 194, "where recovery of attorneys' fees is not specified in the parties' contract or where there is no collateral fund from which they can be recovered, a claim for attorneys' fees cannot be asserted against the assets of a failed bank." *Interfirst Bank Abilene, N.A. v. Federal Deposit Ins. Corp.,* 777 F.2d 1092, 1097 (5th Cir.1985). Because the RTC has not argued that § 194 would prohibit the award of attorneys' fees, and because the contract in this case provided for attorneys' fees, we need not consider whether

§ 194 would prohibit an award of attorneys' fees against the RTC if the contract did not provide for the award.

7. The court in *Heinhold Commodities* also held that a fee award is a first priority unsecured claim pursuant to 12 C.F.R. sections 360.2(a)(1). 803 F.Supp. at 1348–49. We do not consider whether WTI's claim for fees is entitled to first priority because the parties have not raised that issue.

a failed institution without resorting to litigation.'" *Meliezer*, 952 F.2d at 883 (quoting *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 396, *cert. denied*, ── U.S. ──, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991)).

Unlike a creditor's claim, however, a claim for attorneys' fees is inextricably tied to the underlying litigation. *See Title Ins. Co. v. Acumen Trading Co.*, 121 Ariz. 525, 526, 591 P.2d 1302, 1303 (1979) (award of attorneys' fees under A.R.S. section 12–341.01 was inextricably tied to summary judgment, thus constituting a single claim for purposes of Rule 54(b) of the Arizona Rules of Civil Procedure). The trial judge, who has been involved throughout the litigation, can determine both the propriety and the amount of a fee award more readily than can an administrative claims processor who is unfamiliar with the subject of the litigation and the conduct of the parties. Requiring parties to pursue "claims" for attorneys' fees administratively through RTC thus would serve only to frustrate and delay the process. Such a requirement would be antithetical to the statute's purpose to "quickly and efficiently resolve claims against a failed institution without resorting to litigation." *Meliezer*, 952 F.2d at 883.

■ Finally, RTC's interpretation of section 1821(d)(13)(D) rests upon the assumption that Congress intended the RTC, rather than the court, to decide the propriety and amount of attorneys' fees and sanctions arising from litigation. Generally, however, determining a reasonable amount of fees or sanctions to award is left to the discretion of the trial judge. *See James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 319, 868 P.2d 329, 332 (App.1993), *review denied* (March 1, 1994) (all aspects of a trial court's Rule 11 ruling are reviewed for abuse of discretion); *Woliansky v. Miller*, 146 Ariz. 170, 172, 704 P.2d 811, 813 (App.1985) (determination of "reasonableness" of contractual award of attorneys' fees is within the discretion of the trial court). RTC's position would require the RTC to perform a strictly judicial function: determining whether to impose sanctions and award fees *incurred in litigation.* Absent a clearer mandate, we will not ascribe

to Congress the intent to have RTC perform this judicial function.

For the foregoing reasons, we hold that a request for costs, attorneys' fees, or sanctions is not a claim for the purposes of 12 U.S.C. section 1821(d)(13)(D).

2.

The trial court stated that it would have awarded the full amount of fees and costs requested by WTI but for its conclusion that 12 U.S.C. section 1821(d)(13)(D) precludes the award. Furthermore, RTC conceded that WTI was entitled to fees under the contract and that the amount WTI claimed was reasonable. Because we hold that section 1821(d)(13)(D) does not preclude an award of costs and fees, we remand to the trial court with an instruction that the court enter judgment against RTC for WTI's taxable costs and the full amount of requested fees.

B.

In moving to dismiss the application for fees and sanctions, RTC's counsel conceded that FIRREA did not prevent the trial court from considering WTI's request for sanctions against RTC's counsel under Rule 11 and A.R.S. section 12–349. RTC contends that, by failing to award WTI sanctions against RTC's counsel, the trial court denied that request on the merits. We do not find the trial court's ruling so clear. The court's minute entry does not address the question of sanctions. Instead, the court indicated only that the court felt constrained by the statute:

> Were it not for the existence of the Federal statute, the Court would have allowed full attorney's fees and costs against Plaintiff in the amount of $35,924.55. The reason for signing the form of judgment without fees or costs is because of the FIRREA statute.

We simply cannot determine whether or how the court ruled on the request for sanctions against RTC's counsel.

■ Given RTC's concession that FIRREA does not preclude sanctions against RTC's counsel, and given our holding that section 1821(d)(13)(D) does not prevent the

court from awarding sanctions against RTC, we remand to the trial court to consider WTI's request for sanctions. We note that if the court decides to award sanctions, it must make proper findings to support its conclusion. *State v. Richey,* 160 Ariz. 564, 565, 774 P.2d 1354, 1355 (1989); *Wells Fargo Credit Corp. v. Smith,* 166 Ariz. 489, 497, 803 P.2d 900, 908 (App.1990).

### C.

WTI also appeals from the denial of its request to propound discovery on RTC's counsel. WTI sought the discovery to enable it to fortify its request for sanctions.

We need not address this issue at this time. The trial court indicated that it would grant the full amount of the fees WTI requested, but it did not specify the basis, i.e., whether for sanctions or under the contract. Assuming the latter, the court may have felt that additional discovery was unnecessary. Because the court will revisit the issue of sanctions on remand, it may determine the issue anew.

### IV.

We affirm the judgment in favor of defendant WTI. We remand the matter to the superior court with instructions to enter an award of attorneys' fees against RTC, pursuant to the contract, in the amount of $35,-924.55, as well as taxable costs. The court is further instructed to determine whether to award sanctions against RTC, its trial counsel, or both.

WTI has requested attorneys' fees on appeal, and is entitled to them under the contract. The request is granted, pending submission of a properly documented statement pursuant to Rule 21(a) of the Arizona Rules of Civil Appellate Procedure.

CLABORNE, P.J., and GERBER, J., concur.